UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

---

UNITED STATES OF AMERICA, *ex rel.,*
ABC,

|  |  |
|---|---|
| Plaintiff, | CASE NUMBER: |
| v. | JURY TRIAL DEMANDED |
| XYZ, | Filed Under Seal |
| Defendants. | 31 U.S.C. § 3730(b)(2) |

---

## COMPLAINT
**Claims Pursuant to the False Claims act, 31 USC § 3729, et seq.**

**[FILED IN CAMERA AND UNDER SEAL]**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

---

UNITED STATES OF AMERICA, *ex rel.,*
MARTIN L. MCLENDON

               Plaintiff,

     v.

ATAOLLAH "BUBBA" MASOODZADEHGAN,
FALCON ENTITY, LLC, PHOENIX
PETROLEUM, LLC, UNITED NATIONAL
BANK, MICHAEL L. CHASTAIN, JOHN
RANDALL HOLTON, BRUMBLEY
CREEK PROPERTIES, LLC, and
ED SCHULER,

               Defendants.

CASE NUMBER:   1:20-CV-132 (LAG)

**<u>Jury Trial Demanded</u>**

---

**COMPLAINT**

**Claims Pursuant to the False Claims Act, 31 USC § 3729, *et. seq.***

---

# I.   INTRODUCTION

1.      The United States of America, by and through *qui tam* originating Relator Martin L. McLendon ("Relator"), hereby bring this action pursuant to the False Claims act ("FCA), as amended, 31 U.S.C § 3729, *et seq.,* against Ataollah "Bubba" Masoodzadehgan, Falcon Entity, LLC, Phoenix Petroleum LLC, United National Bank, Michael L. Chastain, John Randall Holton, Brumbley Creek Properties, LLC, and Ed Schuler, alleging that the Defendants, in part, knowingly conspired to and in fact withheld material information from and made false statements to the Small Business Administration (hereinafter SBA) to induce the SBA to fund a loan under the 504 loan program (13 C.F.R. §§ 120.800-120.991) in the amount of $1,549,435.30.

2.      Relator has standing to bring this action pursuant to 31 U.S.C § 3730(b)(1).

3.      Relator's complaint is not based on any other prior public disclosures of the allegations or transactions discussed herein in a criminal, civil, or administrative hearing, lawsuit or investigation or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

# II.   PARTIES

4.      Relator is the manager of MAI Services, LLC, a limited liability company organized and existing under the laws of the State of Georgia, and CEO of McLendon Acres, Inc., a Georgia corporation organized and existing under the laws of the State of Georgia.

5.      Defendant Ataollah "Bubba" Masoodzadehgan ("Masoodzadehgan") is an individual who, on information and belief, currently resides at 425 East 76th Street Unit 2B, New York, New York 10021. Masoodzadehgan was the sole owner of Falcon Entity, LLC, Phoenix Petroleum, LLC, all of which were administratively dissolved on December 7, 2016.

6.      Falcon Entity, LLC ("Falcon") was a limited liability company organized under the

laws of the State of Georgia with its principal place of business at 1920 Albany Highway, Dawson, Georgia. Falcon does not have a registered agent inasmuch as it was administratively dissolved on December 7, 2016.

7.     Phoenix Petroleum, LLC, ("Phoenix") was a Georgia limited liability company with its principal place of business at P.O. Box 22, Dawson, Georgia, 39842. Phoenix does not have a registered agent inasmuch as it was administratively dissolved on December 7, 2016. Hereinafter Falcon and Phoenix are collectively referred to herein as the "Masood. Corporate Defendants."

8.     United National Bank ("UNB") is a public company/bank with its principal office located at P.O. Box 150, Cairo, Grady County, Georgia.

9.     Michael L. Chastain ("Chastain") is an individual who resides within the State of Georgia. At all times relevant to this Complaint, Chastain was the president and CEO of UNB in Cairo, Grady County, Georgia. Chastain may be served at his residence address at 115 Magnolia Dr., Cairo, Georgia 39828.

10.     John Randall Holton ("Holton") is an individual who resides within the State of Georgia.  At all times relevant to this Complaint, Holton was a member of the board of directors of UNB. Holton is the sole owner and operator of Brumbley Creek Properties, LLC.  Holton may be served at his residence address at 2584 Pine Park Road, Cairo, GA 39828.

11.     Brumbley Creek Properties, LLC ("Brumbley") is a limited liability company organized and existing under the laws of the State of Georgia with its principal place of business being located at 2584 Pine Park Road, Cairo, Georgia, 39828. Brumbley may be served with Summons and Complaint by serving its registered agent, Holton, located at 2584 Pine Park Road, Cairo, Georgia, 39828.

12.     Ed Schuler is an individual who, on information and belief, resides at and may be served at 4629 Adelaide Ave., North Port, Florida, 34288. Schuler was the CFO of Phoenix and worked with Masoodzadehgan and the remaining defendants to acquire Falcon an SBA 504 loan.

### III.     JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action under 28 U.S.C §§ 1331, 1345, and 1367(a) and 31 U.S.C § 3732.

14.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 332(a), which authorizes nationwide service of process in cases brought under the False Claims act, and because *inter alia*, all Defendants either currently or have previously maintained offices in this District, have transacted business in this District, have engaged in wrongdoing in this District, and have at least minimum contacts with the District.

15.     Venue in the Middle District of Georgia is appropriate under pursuant to 28 U.S.C. §1391 and 31 U.S.C. §3732(a) because, at all times material to this civil action, the Defendants transacted business in the Middle District of Georgia or submitted or caused the submission of false claims in the Middle District of Georgia.  Additionally, Defendant UNB maintains an office in this district and Defendants Holton and Chastain reside in this district.

### IV.     STATEMENT OF FACTS

### A.     THE FALSE CLAIMS ACT

16.     The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, " is liable to the United States for a civil monetary penalty plus treble damages.  31 U.S.C. § 3729(a)(l)(A)-(B).

17.     The terms "knowing" and 'knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(l)(A)(i)-(iii).  Proof of specific intent to defraud is not required.  31 U.S.C. § 3729(b)(l)(B).

18.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property request or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded…"31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

19.     [T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of the money or property.  "31 U.S.C. § 3.729(b)(4).

**B.     SMALL BUSINESS ASSOCIATION 504 LOAN PROGRAM**

20.     The SBA's 504 Loan Program offers small-businesses long-term, fixed-rate financing to acquire major fixed assets for expansion or modernization.

21.     A Certified Development Company ("CDC") is a nonprofit corporation certified by the SBA that generates, closes, and services 504 loans. In this case, the Certified Development Company which serviced the at issue 504 loan was CSRA Local Development Corporation ("CSRA").

22.     Financing of 504 projects typically consists of (1) a contribution from the borrower covering approximately 10 percent of the project costs; (2) a loan obtained from a CDC and assigned to SBA, covering approximately 40 percent of the project costs and certain administrative costs, collateralized by a second lien on the project property; and (3) a loan secured from  private sector lender covering the remainder of the project costs (approximately 50 percent) and collateralized by a first lien on the project property.  13 C.F.R. § 120.801 §120.900.

23.     In general, a borrower applies for 504 financing through a CDC.  If the SBA approves the loan application, the SBA issues a loan authorization agreeing to guarantee part of the financing for the project if certain conditions are met.  After the loan authorization, projects usually require interim financing before the completion of the 504 project.  This interim financing is often provided by the same private sector lender that provides a portion of the permanent financing.  Once the 504 project is completed, the CDC is responsible for closing the 504 loan.  If all the requirements of the loan authorization are met, the loan is bundled with other loans and sold on the public market as a debenture.  The debenture is guaranteed 100 percent of the SBA with the full faith and credit of the United States.  Proceeds from the sale of the debenture fund the 504 loan and pay off the interim loan.

24.     Before the 504 loan closing, the interim lender, the borrower, and the CDC must certify that since the date of the loan application, there has been no unremedied substantial adverse change in the borrower's financial condition or ability to repay the 504 loan.  13 C.F.R. § 120.892.

25.     The SBA may decline to close the debenture, direct the transfer of the 504 loan to another CDC, or cancel its guarantee of the debenture prior to the sale if the CDC, third party lender, or the borrower failed to disclose or misrepresented a material fact to the SBA regarding

the project or the 504 loan, or if the SBA determines that there has been an unremedied material adverse change since the 504 loan was approved.  13 C.F.R. § 120.960.

## C.  FACTS LEADING TO THE AT ISSUE 504 LOAN

26.     On or around April 17, 2008, Swan Ventures, LLC ("Swan") purchased certain property located at 328 Hwy 84 East, Cairo, Grady County, Georgia ("Cairo Property") by and through financing provided by UNB.

27.     Swan, now administratively dissolved, was owned and operated by Clyatt and Stallings.

28.     In December 2011, UNB issued Loan #19909, a renewal of Swan's previous note, in the principal amount of $1,250,000.00. Loan #19909 was secured by a certificate of deposit owned by Stallings, individually, worth approximately $1,200,000.00.

29.     Beginning in September 2012, Ataollah or some combination of the Masood. Corporate Defendants approached Relator and the Contractors and sought to retain their services to demolish an existing structure and to construct a truck stop and gas station ("the truck stop") in its place. The demolition and construction ("the Cairo Construction") was to take place on the Cairo Property.

30.     On August 17, 2012, UNB disbursed Loan #25095 in the amount of $353,018.00 as a line of credit to Phoenix for operating capital.

31.     On October 12, 2012, the UNB Loan Committee approved UNB Loan #25318 to Falcon in the amount of $1,600,000.00 for "Line of Credit for Construction of convenience store & truck stop" ("Construction Loan"). Collateral for the Construction Loan was to be "[a]ll right, title and interest of debtor together with all inventory, equipment and fixtures and 6.069 acres at 328 US 84 & 337 6th Ave. N.E."

32.     Falcon was not formed by Ataollah until October 16, 2012. Thus, the UNB Loan Committee approved a $1,600,000.00 loan for an entity that did not yet exist secured by property, inventory, equipment, and fixtures not even owned by the nonexistent entity.

33.     In an email to Randy Griffin, President of CSRA, dated September 28, 2012, Defendant Chastain made clear the importance of Falcon acquiring an SBA 504 loan. Chastain's 9/28/12 email stated:

> We are setting on go to start the deal. I told the customer we did not want to proceed until we followed the correct path so that we do not do anything that would prevent us from doing a 504.

34.     Holton formed Defendant Brumbley on October 16, 2012.

35.     On October 29, 2012, in a straw transaction, Swan sold the Cairo Property to Brumbley for $1,250,000.00. Brumbley purchased the Cairo Property via an unsecured promissory note in favor of Stallings, individually. The unsecured promissory note accrued interest at one percent per annum and purported to mature on October 28, 2014.

36.     On October 29, 2012, UNB issued Loan #25318 to Falcon in the amount of $1,600,000.00 for the "construction of [a] convenience store and truck stop." This loan was secured by a Deed to Secure Debt from Brumbley to UNB which **made NO mention of Falcon whatsoever, and instead, named Brumbley as the indebted party.**

37.     On October 31, 2012, the Relator and the Contractors reached an agreement with Ataollah, Falcon and/or Phoenix to perform the Cairo Construction in exchange for Ataollah's promise to tender timely payments on a regular basis at a rate of 10% above and beyond all labor, costs and expenses incurred by the Contractors (the "Construction Contract").

38.     In November of 2012, UNB released construction draws #1 and #2 to Ataollah and the Masood. Corporate Defendants. These draws were released **BEFORE**: (1) the issuance of a

building permit; (2) the renovation and construction drawings were completed; and (3) the start of the Cairo Construction. The first two construction draws collectively amounted to $532,720.00.

39.    On March 13, 2013, UNB issued Loan #25669 in the amount of $100,272.00 to Phoenix as a line of credit.

40.    On March 15, 2013, the SBA issued its original "Authorization for Debenture Guarantee (SBA 504 Loan)" [SBA Loan # 60288250-00] stating that "SBA will guarantee . . . a 20 year Debenture ("Debenture") in the amount of $1,186,000.00 to . . . fund a 504 Loan ("the Loan") to assist . . . Falcon Entity, LLC d/b/a Great American Travel Center." **A condition of closure of the loan was stated to be that "[a]t the time of Closing . . . there must be no contractor's, mechanic's or materialman's lien on the Property, including a lien which might possibly be filed after Closing . . ."**

41.    Even though the SBA loan had been accepted, it would not close until over a year later. In the interim, UNB consistently artificially and fraudulently inflated Ataollah's and the Masood. Corporate Defendants' financial position so as to ensure that the SBA loan would close.

42.    In order to "prop up" Ataollah and create the illusion that he was financially stable, UNB issued loan after loan to Ataollah and the Masood. Corporate Defendants.

43.    On March 27, 2013, UNB issued Loan #25701 in the amount of $100,250.00 to Phoenix as a line of credit.

44.    Between November 2, 2012 and May 22, 2013 UNB released draws #1 through #15 to Phoenix and administered the entire Construction Loan. As of the taking of construction draw #15 on May 22, 2013, **the Bank Defendants knew that Ataollah and the Masood. Corporate Defendants had taken the full $1,600,000.00 in draws on a construction project that had not even reached the completion of its first phase.**

45.     Rather than halting the project, the Bank Defendants moved forward with direct and indirect loans to Ataollah and the Masood. Corporate Defendants so that the project would complete and the SBA loan would issue.

46.     On May 29, 2013, UNB issued Loan #25884 in the amount of $300,150.00 to Phoenix for the stated purpose of "finish[ing the] construction on [the] truck stop." Loan #25884 operated as a line of credit.

47.     On June 24, 2013, UNB issued Loan #25968 in the amount of $350,270.00 to Phoenix as an additional revolving line of credit.

48.     **By the time the Contractors completed the first phase of the Cairo Construction in July 2013, UNB had already issued Ataollah and the Masood. Corporate Defendants approximately $2,200,000.00 in loans**.

49.     On July 10, 2013, Chastain e-mailed Susie Young of CSRA: "Susie, we are finally close to having the truck stop completed. What do I need to provide you to start the closing process?"

50.     That same day Susie replied in part:

Have all the construction/renovation costs (contractors) been paid? <u>Evidence of such will need to be provided.</u>

Has the construction loan been fully disbursed? <u>Evidence of such will need to be provided (print out of loan history).</u>

After the contractor and equipment vendors have been paid, the borrower's cash injection has been completed, and the construction loan has been completely disbursed, I will turn the SBA 504 loan file over to our Loan Closing Officer Lori Cope for the closing checklist.
(Emphasis in original).

51.     Chastain forwarded the e-mail to Ataollah with the following comments: "I emailed Randy Griffin's office today to let them know we are close to being ready to close and see what

we needed to complete. I wanted to forward to you so we could start on the items now that we could get ready. Let me know any way I can help with this."

52.     In addition to seeking SBA funding, the Bank Defendants, Ataollah, and the Masood Corporate Defendants had pursued an alternative track with the USDA seeking similar government backed funding.  The pursuit of this financing with the USDA provided a clear picture of how non-creditworthy Ataollah and the Masood Corporate Defendants were.

53.     On July 18, 2013, Lindy Rogers with Spectrum Financial emailed Chastain, in part: "In my discussions with Bubba, it will be impossible to get a 90% guarantee on this loan due to the existing level of USDA loans that have been granted to Phoenix presently."

54.     Again, rather than halting the project, UNB pushed forward and continued to loan more money to the Masood. Corporate Defendants.

55.     On July 30, 2013, UNB renewed Loan #25884 to Phoenix in the amount of $200,000.00.

56.     On the same day, UNB issued Loan #26080 in the amount of $401,794.00 to Falcon to purchase fuel and store inventory.

57.     Even after receiving over $600,00.00 in loans from UNB, Ataollah's financial condition was still so abysmal that Chastain advised Schuler how to obtain money from the City of Cairo Revolving Loan Fund Committee ("RLFC"). Ataollah sent a letter **that same day** to the RLFC formally requesting a $200,000.00 loan.

58.     On September 10, 2013, UNB issued Loan #26168 in the amount of $200,000.00 to Phoenix for operating capital.

59.     On October 4, 2013, the UNB Loan Committee, including Stallings who had direct financial interest in the loan, issued Loan #26226 to Brumbley in the amount of $300,000.00 for

"commercial/working capital" secured by a Deed to Secure Debt from Brumbley to UNB.[1]

60.     Loan #26226 was issued to Brumbley on October 8, 2013. The same day, in a straw transaction pursuant to Chastain's direction, $292,000.00 of the loan was immediately transferred to Ataollah or some combination of the Masood. Corporate Defendants.

61.     The Defendants failed to notify CSRA or the SBA of Brumbley's transfer of the loan's proceeds to Ataollah.

62.     Information regarding Brumbley's transfer of the proceeds of Loan #26226 to Ataollah was material and had a natural tendency to influence CSRA's decision to close upon the SBA 504 loan and the SBA's decision to fund the loan.

63.     In or around September 2013, the Cairo Construction, including the truck stop, was completed. The truck stop opened for business on September 17, 2013 and generated significant revenue and/or income.

64.     UNB issued Loan #26431 to Phoenix on December 31, 2013. Loan #26431 was a revolving draw loan in the amount of $550,250.00. On June 30, 2014, UNB renewed loan #26431 to Phoenix in the amount of $550,000.

65.     All of the UNB issued loans possess two main similarities: 1) the loans were directly related to the Cairo Construction and 2) the loans were utilized to prop up the financial position of Ataollah and Masood. Corporate Defendants so as to ensure that the SBA loan would fund.

66.     From October 29, 2012 to June 30, 2014, UNB issued at least $3,000,000.00 in loans, directly and/or indirectly, to Ataollah purportedly for the Cairo Construction.

---

[1] It is uncontroverted that Brumbley was not engaged in the business of any kind. Brumbley was nothing more than a shell corporation created for the sole purpose of buying and selling the Cairo Property. Accordingly, Brumbley did not possess a need for "commercial/working capital."

67. The Defendants conspired to use the proceeds of the UNB issued loans to mitigate Ataollah and the Masood. Corporate Defendants' outstanding debts so as to ensure the SBA 504 loan's closing.

68. Despite UNB continuing to extend loans, Ataollah and the Masood. Corporate Defendants were consistently overdrawn and asking for more money. On December 4, 2013, December 10, 2013, January 7, 2014, and February 10, 2014 Schuler emailed Chastain notifying him that they were going come up "short" for the day.

69. On January 24, 2014, Chastain emailed Schuler: "anything you can pay down on the renewed line of credit #26431 will help even if you have to redraw next week."

70. On February 20, 2014, Schuler emailed Chastain requesting a $250,000.00 increase in the Masood. Corporate Defendants' line of credit. Later the same day, Schuler emailed Chastain again warning Chastain that the Masood. Corporate Defendants were going to need Chastain's "help tomorrow for around $80,000."

71. On February 27, 2014, Chastain informed Schuler the increase in line of credit would likely not be granted because UNB had "two temporary loans still on the books that have not been paid as planned." The Bank Defendants were wholly aware of Ataollah's financial condition as they were hesitant to extend Ataollah additional funds.

72. On or about April 3, 2014 UNB issued Loan #26598 to Phoenix in the amount of $250,000.00 for "operating capital." Loan #26598 was secured by all inventory and account receivables of every type and nature acquired in the course of business by Phoenix. Loan #26598 was to be repaid in full at the "closing of [a] sale lease back or [the] SBA 504 loan."

73. On April 30, 2014, in preparation of the SBA 504 Loan's closing, UNB issued a renewal note to Falcon renewing Loan #25318 ($1,600,000.00), Loan #26226 ($300,000.00), Loan

#26598 ($250,000.00), Loan #25884 ($200,150.00), and Loan #26431 ($285,956.35). As part of the loans' renewal, said loans were all consolidated into Loan #25318, raising the amount of Loan #25318 to $2,636,206.25 ("Consolidated Cairo Loans").

74.     Falcon's renewal of the Consolidated Cairo Loans includes Loan #26226, a loan originally issued to Brumbley.

75.     Notably, although Loan #25318 purports to be in the amount of $2,636,206.25 the actual total amount of the loans consolidated under the Consolidated Cairo Loan totaled $3,000,000.  The discrepancy equals almost exactly the capital outlay required by Ataollah and the Masood. Corporate Defendant's to qualify for the SBA loan.

76.     On May 9, 2014, Lori Cope of CSRA sent an e-mail to Chastain and Edwin Byck with an attached letter dated May 9, 2014, from Lori Cope/CSRA Business Lending to Chastain and Ataollah, demanding that UNB produce the "[f]inal lien waiver(s)/affidavit(s) from construction contractor(s)" with respect to the Cairo Property.

77.     The May 9, 2014 letter from Lori Cope set out 14 items in addition to the demand for final lien waivers and affidavits from the construction contractors.

78.     The Contractors never signed the final lien waivers/affidavits referenced in Lori Cope's letter.

79.     On May 14, 2014, Schuler e-mailed Chastain, with a copy to Ataollah, stating: "Here are the lien waivers. I have everything else ready to go to Lori. Just need to finish the detailed equipment list and I will be faxing the items to her this afternoon."

80.     One of the attachments to the May 14, 2014 e-mail was titled "FULL, UNCONDITIONAL WAIVER" and reads in pertinent part:

> My/our contract with Falcon Entity, LLC to provide all materials and labor for the improvement of the property described as Great American Travel Center[,] 328

Highway 84 East, Cairo, GA 39828[,] having been fully paid and satisfied, by signing this waiver, all my/our construction lien rights against such property are hereby waived and released.

The Full Unconditional Waiver is dated May 13, 2014 and executed by Schuler on behalf of Phoenix.

81.     A forged lien waiver purporting to be submitted by the Relator to the SBA on behalf of the Contractors.

82.     Even though UNB renewed Loan #26431 for $268,133.55 one day prior, Ataollah and the Masood. Corporate Defendants' accounts were overdrawn on May 21, 2014. Schuler emailed Chastain, stating that they were over drafted $160,000 and would need about $210,000 to "take care of the incoming drafts."

83.     On June 10, 2014, merely one month before the SBA loan closed, Chastain was again expressly made aware of Ataollah and the Masood. Corporate Defendants' financial struggles. In an email to Chastain, Schuler explained that even "[w]ith the incoming EFTs, sweeps, and deposits", they would "need about $210 [$210,000] today." Chastain and UNB were intimately familiar with Ataollah's constant need for more cash, yet they affirmatively concealed this fact from SBA.

84.     With the closing date quickly approaching, on June 30, 2014, UNB approved three loan renewals, including renewal of Loan #26580 which had matured two months prior, yet no action taken on the part of the bank to recover the unpaid principal. These last second renewals evidence UNB's determination to continue to falsify Ataollah and the Masood. Corporate Defendants' financial position so as to ensure that the SBA loan would close.

85.     The SBA 504 loan closed on July 10, 2014.

86.     At the time of the SBA 504 loan's closing, the SBA, through CSRA, entered into

two written agreements with UNB concerning the Cairo Property: a Third Party Lender Agreement and an Interim Lender Certificate.

87.     Under the terms of paragraph three (3) of the Third Party Lender Agreement, UNB represented that all information provided to CSRA was accurate to the best of its knowledge and that it had not withheld any material information.

88.     Under the terms of paragraph six (6) of the Interim Lender Certification, UNB represented that it had no knowledge of any unremedied substantial adverse change in Falcon's financial condition.

89.     UNB acknowledged in the Third Party Lender Agreement and in the Interim Lender Certification that the SBA and CSRA were relying upon the information provided by UNB. UNB further acknowledged in the Third Party Lender Agreement and in the Interim Lender Certification that CSRA was acting on the behalf of the United States Government, and that any false statement to CSRA could result in liability for treble damages under the False Claims Act, 31 U.S.C. §§ 3729-3733.

90.     The representations made by UNB in the Third Party Lender Agreement and in the Interim Lender Certification were knowingly false. UNB knew that Ataollah and Masood. Corporate Defendants' financial position had substantially changed since the SBA application had been accepted. Despite this knowledge, UNB executed the Third Party Lender Agreement and the Interim Lender Certification so as to ensure the closing of the SBA 504 loan.

91.     On July 10, 2014, Falcon and Phoenix executed a Borrower and Operating Company Certification certifying to the SBA and CSRA that neither entity had an unremedied substantial adverse change in their financial condition since Falcon's application for the SBA 504 loan.

92.     As part of the SBA 504 Loan's closing, UNB issued Loan #26830 to Falcon in the amount of $2,213,479.00. Loan #26830 operated as the Third Party Lender Loan.

93.     The proceeds of Loan #26830 were used by Falcon to pay off the majority of the Consolidated Cairo Loans.[2]

94.     On July 10, 2014, UNB issued Loan #26831 in the amount of $1,549,435.30 to Falcon. In the case at hand, Loan #26831 operated as the Interim Loan.

95.     The SBA guaranteed and CSRA sold as debentures an amount equal to the Interim Loan.

96.     Under the terms of Third Party Lender Loan, Falcon was to make monthly payments of $15,011.96 beginning August 10, 2014.

97.     Under the terms of the Interim Loan, Falcon was to make regular monthly interest payments on the loan in the amount of $10,983.55 beginning September 1, 2014.

98.     On July 17, 2014, only one week after the SBA loan closed, UNB issued Loan #26865, "a revolving draw loan," to Falcon in the amount of $325,000.00. Loan #26865 was secured by a deed to secure debt from Brumbley to UNB.

99.     On information and belief, UNB issued Loan #26865 to Falcon to ensure that Falcon did not default on Third Party Lender Loan or Interim Loan prior to the funding of the SBA 504 Loan.

100.    The Defendants derived substantial benefits from the fraudulently acquired SBA 504 loan and from the valuable improvements the Contractors made to the Cairo Property.

---

[2] In paying off the majority of the Consolidated Cairo Loans, Loan #26830 paid off the majority of Loan #26226. Accordingly, a loan issued to Brumbley (the proceeds of which were transferred to Ataollah) was subsequently paid off by UNB's portion of an SBA 504 loan issued to Falcon. Furthermore, while UNB's portion of the SBA 504 loan only amounted to fifty percent of the Total Project Cost, said investment was secured by a first priority lien over the entire Cairo Property.

101.    Immediately after the closing of the SBA 504 loan, UNB entered into a participation agreement with Thomasville National Bank wherein UNB sold Interim Loan to Thomasville National Bank for $1,549,435.30.

102.    Falcon used the proceeds of Interim Loan to purchase 5.472 acres of the Cairo Property from Brumbley for $1,126,957.95.

103.    After selling the truck stop to Falcon, Brumbley (and thus Holton) used the purchase price satisfy $1,250,000.00 unsecured note with Stallings, while maintaining over 2 acres from the original piece of property purchased by Brumbley from Swan.

104.    The closing of the SBA 504 loan also permitted UNB to substantially mitigate its risk regarding the loans previously issued to Ataollah and the Masood. Corporate Defendants.

105.    Once the SBA loan closed, UNB's permanent finance loan (Loan #26830; $2,213,479.00) was secured by a first priority lien in the Cairo Property which had recently been substantially improved by the Contractors' uncompensated efforts.

106.    UNB further benefitted from Falcon's use of the funds the SBA guaranteed and caused to be funded. As stated above, the SBA guaranteed and caused to be funded $1,549,435.30 of the SBA 504 loan.

107.    As stated above, the Cairo Property served as collateral for all of the UNB issued loans prior to SBA loan's closing. Hence, in the event that Ataollah and/or the Masood. Corporate Defendants defaulted on the UNB loans prior to the SBA loan's closing, UNB would have had to foreclose upon property owned by of its board members i.e., Holton. UNB and Holton were able to shift this risk to Ataollah by ensuring the closing of the SBA 504 loan through fraudulent means.

108.    On or around August 13, 2014, the portion of the SBA 504 loan guaranteed by the SBA was funded.

109.    Less than four months later, on December 11, 2014, the UNB Loan Committee approved Loan #27235 to Brumbley in the amount of $328,480.26. The stated purpose of Loan #27235 was to "payoff loan #26865 (Falcon Entity)."

110.    Accordingly, Brumbley (and thus Holton) paid off a loan issued to Falcon by UNB for the sole purpose of ensuring that Falcon did not default on the Third Party Lender Loan or Interim Loan prior to the funding of the SBA 504 Loan. These transactions were never disclosed to the SBA.

111.    On October 30, 2014, Ataollah shot himself in his hotel room with a pistol in an apparent attempt to commit suicide.

112.    Shortly thereafter, Falcon defaulted on the SBA 504 loan and UNB foreclosed upon the Cairo Property.

113.    As a result of the forgoing scheme and the false claims for payment asserted to the federal government, the Defendants have defrauded the United States Government out of money in an amount not less than $1,549,435.30.

**D.    False Claims and False Statements of Defendants**

114.    Under the terms of paragraph 7 of the Third Party Lender Agreement, UNB was required to give the SBA and the CDC written notice within thirty days in the event of default by the Ataollah and the Masood. Corporate Defendants on the third-party loan.  UNB was also required to give to SBA and the CDC written notice at least sixty days prior to foreclosure upon the property.

115.    Under the terms of paragraph 3 of the Third Party Lender Agreement, UNB represented that all information provided to CSRA was accurate to the best of its knowledge and that it had not withheld any material information.

116.    Under the terms of paragraph 6 of the Interim Lender Certification, UNB represented that it had no knowledge of any unremedied substantial adverse change in the financial condition of Ataollah and the Masood. Corporate Defendants; that it had disclosed all material information to the CSRA to ensure that the Interim Lender Certification was not misleading; and that Ataollah and the Masood. Corporate Defendants were current on their payments under said loan and were no otherwise in default on the interim loan.

117.    UNB acknowledged in the Third Party Lender Agreement and in the Interim Lender Certification that the SBA and the CDC were relying on the information provided by UNB.  UNB further acknowledged in the Third Party Lender Agreement that CSRA was acting on behalf of the SBA, an agency of the United States Government, and that any false statements made to CSRA could be considered false statements to the SBA.

118.    The certification identified in paragraph 115 and 116 above were false.  Ataollah and the Masood. Corporate Defendants were routinely in default on the Consolidated Cairo Loan and multiple loans which comprised the Consolidate Cairo Loan, the Interim Loan and the Third Party Lender Loan.  Between March 2013 and July 10, 2014 UNB did not disclose to CSRA that Ataollah and the Masood. Corporate Defendants were routinely overdrawn on their lines of credit and deposit accounts, that multiple loans were not being timely repaid, and that UNB even refused to extend additional credit to Ataollah and the Masood. Corporate Defendants.

119.    Less than ten days after the closing on the SBA Loan, on July 17, 2014, UNB issued Loan # 26865 to Ataollah and the Masood. Corporate Defendants as "operating capital." On information and belief, loan #26865 (which was secured by Brumbley Creek), was issued so as to avoid default by Ataollah and the Masood. Corporate Defendants prior to the funding of the SBA loan.

120.    UNB disbursed $325,000 toward repayment of the third party loan and the interim loan.

121.    UNB nor Ataollah and the Masood. Corporate Defendants disclosed to CSRA that Contractors had not been paid for the Cairo Construction.

122.    The Bank Defendants and/or some combination of Schuler, Ataollah and the Masood. Corporate Defendants submitted one or more forged lien waivers to CSRA.

123.    The SBA 504 Loan closed July 10, 2014.  CSRA executed the CDC Certification, certifying that there had been no unremedied substantial adverse change in Ataollah and the Masood. Corporate Defendants' financial condition since the date of the application for the 504 loan.

124.    On July 10, 2014, Ataollah and the Masood. Corporate Defendants executed the Borrower and Operating Company Certification, certifying to CSRA and the SBA that there had been no unremedied substantial adverse change in Ataollah and the Masood. Corporate Defendants financial condition since the date of their application for the 504 loan.

125.    Ataollah and the Masood. Corporate Defendants' Borrower and Operating Company Certification was false.

126.    Prior to the closing of the 504 loan, neither UNB nor Ataollah and the Masood. Corporate Defendants notified CSRA or the SBA of any of Ataollah and the Masood. Corporate Defendants' late payments on the third party loan or the interim loan.  Prior to the closing of the 504 loan, neither UNB nor Ataollah and the Masood. Corporate Defendants disclosed to the SBA or CSRA that Ataollah and the Masood. Corporate Defendants capital outlay was composed of funds issued to Ataollah and the Masood. Corporate Defendants through various previous loans which were combined into the Consolidated Cairo Loans and ultimately part of the third party

lender loan.  Subsequent to the closing of the 504 loan, neither UNB nor Ataollah and the Masood. Corporate Defendants notified CSRA or the SBA of Loan #26856 which was issued in order to avoid default by Ataollah and the Masood. Corporate Defendants on the Interim Loan and the Third Party Lender Loan.

127.    The information regarding Ataollah and the Masood. Corporate Defendants' financial circumstances UNB and Ataollah and the Masood. Corporate Defendants withheld from, or misrepresented to, CSRA and the SBA was material and had a natural tendency to influence the CDC's decision to close the 504 loan and the SBA's decision to fund the 504 loan.

128.    If the SBA had known the information regarding Ataollah and the Masood. Corporate Defendants' financial circumstances that UNB and Ataollah and the Masood. Corporate Defendants withheld or misrepresented, the SBA would have not funded the 504 loan and expended the associated administrative costs.

129.    On August 13, 2014, the SBA 504 loan funded, and $1,549,435.30 was transmitted to UNB to pay off the interim loan.

130.    UNB and Ataollah and the Masood. Corporate Defendants knowingly presented or caused to be presented a false claim or claims for payment or approval to the United States.

131.    UNB and Ataollah and the Masood. Corporate Defendants were unjustly enriched in the amount of at least $1,549,435.30.

## V.  CLAIMS AGAINST DEFENDANTS

### COUNT I - VIOLATIONS OF THE FALSE CLAIMS ACT

132.    The allegations of all the preceding paragraphs in this Complaint are hereby incorporated by reference.

133.    31 U.S.C. §§ 3729-3733, provides, in pertinent part, that any person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)     conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

134.    For purpose of the FCA:

(1)     the terms "knowing" and "knowingly"-
    (A)     mean that a person, with respect to information-
            (i)     has actual knowledge of the information;
            (ii)    acts in deliberate ignorance of the truth or falsity of the information; or
            (iii)   acts in reckless disregard of the truth or falsity of the information; and
    (B)     require no proof of specific intent to defraud

135.    Accordingly, the FCA prohibits: the knowing submission of false claims for payment; the knowing use of false records or statements to support such claims; the knowing and improper retention of money owed or belonging to the federal government; or conspiring with other to commit any of those acts.

136.    The Defendants knowingly presented and/or caused to be presented, false or fraudulent claims to the SBA designed to fraudulently induce the United States Government into issuing and guaranteeing, in part, an SBA 504 loan to a wholly unqualified creditor, i.e. Ataollah and the Masood. Corporate Defendants.

137.    The Defendants knowingly presented and/or caused to be presented fraudulent documents and false representations of material fact to the SBA and CSRA with respect to Ataollah and the Masood. Corporate Defendants' credit and Ataollah and the Masood. Corporate Defendants' outstanding obligations to its creditors, including but not limited to the Relator.

138.    The Defendants knowingly withheld material information from the SBA and CSRA regarding Ataollah and the Masood. Corporate Defendants' credit and Ataollah and the Masood. Corporate Defendants' outstanding obligations to its creditors, including but not limited to the Contractors.

139.    The Defendants' false representations and/or purposeful omissions of material facts fraudulently caused the SBA to issue an SBA 504 loan to Falcon which was, in part, guaranteed and indirectly funded by the United States Government.

140.    The Defendants' knowing submission of false claims are repeated violations of the FCA.

## Submission of False Documentation in Support of Claims

141.    The Defendant knowingly presented and/or caused to be presented, false or fraudulent claims to the SBA designed to fraudulently induce the United States Government into issuing and guaranteeing, in part, an SBA 504 loan to a wholly unqualified creditor, i.e. Ataollah and the Masood. Corporate Defendants.

142.    Not only were the Defendants prohibited from filing false claims, they were prohibited from filing false and fraudulent documentation in support of those false claims.

143.    The Defendants knowingly presented and/or caused to be presented fraudulent documents and false representations of material fact to the SBA and CSRA with respect to Ataollah and the Masood. Corporate Defendants' credit and Ataollah and the Masood. Corporate Defendants' outstanding obligations to its creditors, including but not limited to the Relator.

144.    The Defendants knowingly withheld material information from the SBA and CSRA regarding Ataollah and the Masood. Corporate Defendants' credit and Ataollah and the Masood. Corporate Defendants' outstanding obligations to its creditors, including but not limited to the

Relator.

145.     The Defendants' false representations and/or purposeful omissions of material facts in support of the presented false claims are repeated violations of the FCA.

## Conspiracy to Violate the FCA

146.     The allegations of all the preceding paragraphs in this Complaint are hereby incorporated by reference.

147.     Conspiring to violate the FCA is itself a violation of the FCA. The conspirators must agree with each other to do something that would violate any of the provisions of the FCA, they must take action to carry out the agreement, and they must do it with the intent to defraud the government.

148.     Here, the Defendants conspired with each other and with others to defraud the United States Government in violation of 31 U.S.C.  § 3729(a)(1)(A)-(B).

149.     The Defendants conspired with each other and with others to knowingly misrepresent to the SBA and CSRA that all expenses associated with the improvements to the Cairo Property had been paid.

150.     The Defendants conspired with each other and with others to knowingly misrepresent to the SBA and CSRA that all of the information provided with respect to Ataollah and the Masood. Corporate Defendants' financial condition was accurate and that no material information had been withheld.

151.     The Defendants conspired to and knowingly produced a lien waiver possessing the Relator's forged signature to the SBA and CSRA.

152.     The Defendants conspired to defraud the United States Government by having Holton serve as a straw borrower for Ataollah and the Masood. Corporate Defendants and by

concealing the existence of the loan Holton procured for Ataollah and the Masood. Corporate Defendants from the SBA, CSRA, and the Realtors.

153.    The Defendants conspired with each other and with others to issue UNB Loan #26865 to Falcon so as to artificially ensure that Falcon did not default on Loan #26830 (Third Party Lender Loan) or Loan #26831 (Interim Loan) prior to the funding of the SBA 504 loan.

### COUNT II - FINANCIAL INSTITUTIONS REFORM, RECOVERY AND ENFORCEMENT ACT ("FIRREA")

154.    The allegations of all preceding paragraphs in this Complaint are hereby incorporated by reference.

155.    12 U.S.C. § 1833a; 15 U.S.C. § 645(a). In relevant part FIRREA provides that:

(a) Whoever violates any provision of law to which this section is made applicable by subsection (c) of this section shall be subject to a civil penalty in an amount assessed by the court in a civil action under this section.

(b) Maximum amount of penalty
(1) Generally
The amount of the civil penalty shall not exceed $1,000,000.

(2) Special rule for continuing violations
In the case of a continuing violation, the amount of the civil penalty may exceed the amount described in paragraph (1) but may not exceed the lesser of $1,000,000 per day or $5,000,000.

(3) Special rule for violations creating gain or loss

(A) If any person derives pecuniary gain from the violation, or if the violation results in pecuniary loss to a person other than the violator, the amount of the civil penalty may exceed the amounts described in paragraphs (1) and (2) but may not exceed the amount of such gain or loss.

(B) As used in this paragraph, the term "person" includes the Bank Insurance Fund, the Savings Association Insurance Fund, and after the merger of such funds, the Deposit Insurance Fund, and the National Credit Union Share Insurance Fund.

> (c) Violations to which penalty is applicable
>> This section applies to a violation of, or a conspiracy to violate…
>> (3) section 645(a) of Title 15.

156.     Section 645(a) of Title 15 provides that:

> Whoever makes any statement knowing it to be false, or whoever willfully overvalues any security, for the purpose of obtaining for himself or for any applicant any loan, or extension thereof by renewal, deferment of action, or otherwise, or the acceptance, release, or substitution of security therefor, or for the purpose of influencing in any way the action of the Administration, or for the purpose of obtaining money, property, or anything of value, under this chapter, shall be punished by a fine of not more than $5,000 or by imprisonment for not more than two years, or both.

157.     By virtue of the conduct described above, the Defendants knowingly made or conspired to make false statements to the SBA for the purpose of obtaining a loan; for the purpose of influencing the action of the SBA; and for the purpose of obtaining money, property, or anything of value, in violation of 15 U.S.C. § 645(a).

158.     The false statements made, or conspired to be made, by the Defendants resulted in a pecuniary loss to the SBA.

159.     Pursuant to 12 U.S.C. § 1833a(b), the Defendants are liable for a civil penalty not to exceed the pecuniary loss to the SBA.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that judgment be entered in its favor against the Defendants jointly and severally, as follows:

A.  Defendants cease and desist from further violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*

B.  For Defendants' violations of the False Claims act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as required by law, and such other and further relief as the Court deems just and proper.

C.  For Defendants' violations of the FIRREA, for a civil penalty up to maximum amount allowed under FIRREA, and such other and further relief as the Court deems just and proper.

D.  Pursuant to section 3730(d) of the False Claims Act, that the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages allowed under applicable law;

E.  That Relator be awarded all costs of this action, together with all expert witness fees, attorneys' fees, and court costs as fully as is allowed by law pursuant to 31 U.S.C. § 3730(d).

F.  That the United States Government and the Relator receive all relief, both in law and in equity, to which they may reasonably appear entitled to.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, a jury trial is demanded.

This the 10th day of July, 2020.

WATSON SPENCE LLP
*Attorneys for Plaintiff-Relator*

By:  /s/ Christopher S. Cohilas
     Christopher S. Cohilas
     State Bar No. 175377
     ccohilas@watsonspence.com

By:  /s/ Christopher L. Foreman
     Christopher L. Foreman
     State Bar No. 507739
     cforeman@watsonspence.com

     P. O. Box 2008
     Albany, GA 31702-2008
     (229) 436-1545 – Telephone
     (220) 436-6358 – Facsimile